CITIZENS FOR THE PROTECTION OF THE ARBUCKLE-SIMPSON AQUIFER v. OKLA. DEPT. OF MINES



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:CITIZENS FOR THE PROTECTION OF THE ARBUCKLE-SIMPSON AQUIFER v. OKLA. DEPT. OF MINES

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 CITIZENS FOR THE PROTECTION OF THE ARBUCKLE-SIMPSON AQUIFER v. OKLA. DEPT. OF MINES
2019 OK CIV APP 17
437 P.3d 1074
Case Number: 115859
Decided: 07/26/2018
Mandate Issued: 03/27/2019
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2019 OK CIV APP 17, 437 P.3d 1074

 

CITIZENS FOR THE PROTECTION OF THE ARBUCKLE-SIMPSON AQUIFER, Petitioner/Appellant,
v.
OKLAHOMA DEPARTMENT OF MINES, Respondent/Appellee,
and
ARBUCKLE AGGREGATES, LLC, Intervenor.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE BRYAN C. DIXON, TRIAL JUDGE

AFFIRMED AS MODIFIED, 
REMANDED WITH INSTRUCTIONS

Krystina E. Phillips, INDIAN AND ENVIRONMENTAL LAW GROUP, PLLC, Ada, Oklahoma and
Tyler J. Coble, CHEEK LAW FIRM, P.L.L.C., Oklahoma City, Oklahoma, for Petitioner/Appellant

Mark Secrest, CHIEF LEGAL COUNSEL, OKLAHOMA DEPARTMENT OF MINES, Oklahoma City, Oklahoma, for Respondent/Appellee

Elizabeth C. Nichols, ELIZABETH C. NICHOLS, PC, Edmond, Oklahoma, for Intervenor

P. THOMAS THORNBRUGH, CHIEF JUDGE:

¶1 Petitioner, Citizens for the Protection of the Arbuckle-Simpson Aquifer (CPASA), appeals from a trial court judgment upholding an order by the Oklahoma Department of Mines (ODM) granting a non-coal surface mining permit to Arbuckle Aggregates, LLC (Aggregates). Based on our review of the relevant statutory and regulatory provisions as applied to the ODM order and the record of proceedings as set forth below, we affirm the decision as modified herein and remand to ODM with instructions that the agency comply prospectively with this Court's findings concerning applicable notice, hearing, and record compilation procedures.

BACKGROUND

¶2 This appeal arises from a lawsuit filed by CPASA in state district court after ODM granted Aggregates' application for a permit pursuant to the Oklahoma Mining Lands Reclamation Act, 45 O.S.2011 §§ 721, et seq. (OMLRA). The record reveals a long and contentious course of litigation, reflected in a disputed administrative record containing more than 9,000 pages and leading to an agency decision that granted Aggregates a conditional permit to initiate non-coal surface mining activities on a 15-acre plot of land.

I. INITIAL APPLICATION, FIRST NOTICE AND 
FIRST INFORMAL CONFERENCE

¶3 The proceedings began in May 2010, when Aggregates submitted an application seeking a permit to mine limestone, dolomite, shale, sand, gravel, clay, and soil, using quarrying and strip mining methods,[1] on 575 acres in Johnston County. It is undisputed that the mine is ultimately expected to have a "life" of more than 50 years and be more than 200 feet deep.[2] It also is undisputed that the Arbuckle-Simpson Aquifer, a sensitive sole source aquifer, underlies much of Johnston County, and that the mine's proposed site is on or near the aquifer. The average depth to groundwater is not clear from the record, but testimony indicated that the water table generally is within 100 feet below the surface.[3] 

¶4 At the time Aggregates submitted its initial application, ODM, following then-effective statutes and rules, published notice of it in a Johnston County newspaper. After receiving more than 300 written protests and comments, ODM scheduled an informal public conference for December 2, 2010. Numerous individuals and entities -- including surrounding landowners, CPASA, the Oklahoma Department of Wildlife Conservation, the National Park Service, and the U.S. Fish and Wildlife Service -- appeared and spoke against granting the permit. According to the transcript from that meeting, the primary concern of CPASA and many others was the effect of Aggregates' mining operation on the Arbuckle-Simpson Aquifer -- the region's principal water source -- particularly because several existing mines already operate in the area.

¶5 According to the December 2010 conference transcript, the ODM officer conducting the meeting announced that all persons who signed in would receive a copy of the ODM's notice of its "departmental decision" (NDD).[4] He also announced that the gathering was "an informal conference" (IC) at which ODM was present "simply to listen to the concerns of the citizens and to make sure that we make the right decision [in] issuing this permit." Aggregates announced it was submitting supplements to its permit application. The supplements were included as exhibits to the proceeding and the conference officer announced ODM would "hold the record open" until January 14, 2011, should any of the participants want to submit additional information.[5] Departing from its usual practice, however, ODM did not issue an NDD after the IC in December 2010.

II. AMENDED APPLICATION, SECOND INFORMAL CONFERENCE
AND FIRST NDD

¶6 Aggregates provided additional information to ODM prior to January 14, 2011, and submitted an amended application to ODM in August 2011. This was followed by ODM's second publication of notice of the application in an area newspaper. The notice stated it was a "republication" of Aggregates' permit application notice.[6] Although it did not mention that Aggregates had amended the application, it stated that a copy of the complete application was available for public inspection at the Johnston County Courthouse.

¶7 In the meantime, in March 2011, the Oklahoma Supreme Court held unconstitutional the state statute and ODM rule stating that the only persons entitled to protest the issuance of a permit were "property owners and residents of occupied dwellings who may be adversely affected located within one (1) mile" of a proposed mining operation. See Daffin v. State ex rel. Dept. of Mines, 2011 OK 22, 251 P.3d 741. As a result of Daffin, ODM's published notice in August 2011 announcing Aggregates' permit application included a statement that any landowner, resident of an occupied dwelling, public entity or agency, or "any party that may be adversely affected has the right to submit comments or object to the issuance of the permit in writing." [7]

A. Second Informal Conference

¶8 The August 2011 notice also drew protests and comments from numerous individuals, including CPASA, affected landowners, and federal agencies. ODM scheduled a second IC for October 4, 2011. At that conference, the presiding ODM officer again announced that the conference would result in ODM's issuance of an NDD. He stated the notice would be sent only to "qualified protestors,"[8] although it also would be published in the newspaper. The officer read the names of 23 persons whose protests had been timely received after the last (August 2011) publication notice, and stated that those names represented qualified protesters for the conference, as well as the approximately 307 individuals whose names were "on the mail list" from the first IC.[9] The term "qualified protestor" does not appear in ODM rules or applicable statutes, nor do we find the term used in any published Oklahoma appellate opinion.

¶9 A letter from Aggregates submitting an "updated copy" of its permit application was admitted as an exhibit to the second conference. The conference officer said the amended application had been available for public inspection at the Johnston County Clerk's office since August 1, 2011, and that those attending and signing in at the previous conference had received a letter informing them the application was available at the courthouse.[10] He also reiterated that the proceeding was an IC "to hear the public's view."[11]

B. First Findings and Recommendations

¶10 On November 2, 2011, the officer issued his findings and recommendation that Aggregates' permit application be granted conditioned upon its fulfilling a number of requirements.[12] The findings listed 24 persons identified as "[q]ualified protestants appearing by virtue of having complied with the rules," and six "[p]rotestants appearing, but not submitting a letter to ODM requesting an informal conference as required by (45 O.S.2001 § 724(H)(2) and (4) (OAC 460:10-17-6)."[13] The findings also listed protesters' specific concerns, which included, in addition to the possible harm the operation might do to the Arbuckle-Simpson Aquifer, its watersheds, and nearby surface streams and springs, the following: the lack of proper notice of the supplemental materials submitted by Aggregates and lack of notice of the hearing itself; the failure of Aggregates to obtain necessary permits from other agencies concerning the operation; the alleged lack of a hydrologic study by the Oklahoma Water Resources Board (OWRB) for the site; the mining operation's effect on property values in the area; possible dust, fumes, noise, and nighttime activities associated with the operation; and the operation's impact on area wildlife.

¶11 Responding to these concerns, the officer's recommended prerequisites to permit approval included matters specifically addressed to the protection and conservation of water resources of the aquifer; for example, that a proposed groundwater well monitoring program (previously submitted by Aggregates) collect baseline data for a minimum of 12 months prior to commencement of mining, and that a water management plan that Aggregates was submitting to the OWRB become a part of its ODM permit. The officer also noted that, when applicable, Aggregates would need to comply with 82 O.S.2011 § 1020.2.E.1 related to management of pit water. The officer noted Aggregates had submitted two applications to OWRB for permits to use stream or surface water, and recommended that no mining activities be allowed until the OWRB approved those permits.

C. First Notice of Departmental Decision

¶12 On November 14, 2011, ODM issued its first NDD, indicating that Aggregates' application had been conditionally approved substantially as set forth in the conference officer's recommendations. The NDD also stated that within 30 days of receipt of the notice any "person with an interest which is or maybe adversely affected may request a formal hearing on this decision."[14] A certificate of mailing in the Administrative Record indicates that copies of the conference officer's findings and recommendation, along with the first NDD, were either mailed via certified mail or via email to approximately 100 people. [15]

¶13 In response to the first NDD, Aggregates and numerous other parties requested a formal adjudicatory hearing. According to the appellate briefs, prior to the formal hearing Aggregates made additional changes to its application concerning its use and management of groundwater.[16] Aggregates then apparently withdrew its request for a formal hearing. ODM has referred to a formal hearing as having been "dismissed" in December 2012,[17] but the record is unclear as to when a formal hearing actually was scheduled or whether it was dismissed by ODM, by agreement of the parties, or by some other method.

III. AMENDED UPDATED APPLICATION, 
THIRD INFORMAL CONFERENCE AND SECOND NDD

¶14 In any event, in January 2013 Aggregates submitted more "amendments to its previously revised application," with changes that included withdrawing its water monitoring plan altogether and stating that the two stream water use permit applications it had submitted to OWRB had been cancelled.[18] ODM required that Aggregates publish, for the third time, notice of the updated application. Publication occurred in January-February 2013.[19] The published notice mentioned that changes had been made to the application since the last publication, including withdrawal of the water monitoring and management plan and updates to location maps to reflect an incremental bonding plan and the 15-acre "Phase 1bonding area." After again receiving numerous protests, ODM held a third IC, in April 2013.

A. Third Informal Conference

¶15 According to the presiding officer at the third IC, notice of the conference was mailed to "persons who the [ODM] showed as being objectors and other interested persons involved in this proceeding."[20] ODM's general counsel represented that there were 182 names on the matrix to whom notice of the time and date of the conference had been sent, and to whom notice of the second NDD would be sent in addition to publication notice in the newspaper.[21]

¶16 In addition to speaking against the permit, several parties raised questions as to whether the current proceeding was a new proceeding or a continuation of the previous proceeding, and whether documents introduced and comments made at the previous two ICs would be considered as incorporated into the ongoing proceeding. No clear conclusion appears to have been reached as to this question at the conference,[22] but ODM and Aggregates in their briefing and at the later, formal adjudicatory hearing treated the matter as a single, ongoing permit application. As a practical matter, this meant that, because Aggregates' initial application was filed prior to August 2011, it was deemed exempt from OWRB groundwater regulations authorized by 82 O.S.2011 § 1020.2, pursuant to subsection (C) of that statute.[23]

B. Second Findings and Recommendations

¶17 On September 4, 2013, the officer presiding at the third IC issued his findings and recommendation that the permit be conditionally granted.[24] The findings delineated the history of the case to date, noted that the specific issues and discussion set forth by the previous conference officer remained accurate, incorporated the previous NDD's discussion by reference, and stated that records from the two previous conferences were being included and considered.[25] The findings described at length the "major amendments or revisions" to Aggregates' most recently filed application as including the following:

¶18 (1) The amendment changed the "bonded" area for the permit's first year of operation to 15 acres from the original 575 acres.[26] Development beyond 15 acres after the first year of operation was described in a map with the letters "TBD" ("to be determined"). ODM rules allow for incremental bonding but prohibit an operator from mining outside the bonded area.

¶19 (2) The amended application reflected that Aggregates had withdrawn two surface water permit applications on file with the OWRB, replaced by Aggregates' statement in the amended application that its products would be processed with water from "any legal source permissible," and applicable water permits would be obtained "when necessary and/or required." The officer noted that while ODM rules require an applicant to demonstrate that its mining and reclamation operations "can be feasibly accomplished under the mining and reclamation plan" included with its application, ODM does not require, as part of its feasibility analysis, that an applicant obtain OWRB or other permits for mines located in the area (the Mill Creek watershed) of Aggregates' proposed mine. The conference officer's other comments also included the following:

[Aggregates], in previous filings and statements made to ODM, indicated that it owns the groundwater under the 575 acres described for the permit area, and further that it has leased approximately 1,950 acres of water rights (surface and ground). Additionally, [Aggregates] indicates that for initial site work dust control and other construction activities it can truck in the amount of water needed, and further that groundwater will not be encountered in the quarry pit during the initial mining activities.

Regardless of depth to groundwater at the proposed mining site . . . [i]t does appear . . . that eventually [Aggregates] would have to use an amount of water for normal mining operations that would be greater than could feasibly be trucked in, and that possible sources of supply would be [groundwater and surface water accumulating in the quarry pit] as well as surface water in nearby streams and groundwater that could be withdrawn from water wells.

Whether [Aggregates] will need a permit or permits . . . will be matters for the OWRB to determine. . . . If such a permit or permits are required . . . [Aggregates] would have to obtain the same to . . . avoid being shut down by ODM's enforcement of the mining permit condition to comply with all government permits and licenses.[27]

¶20 The conference officer rejected the claim by several protesters that Aggregates' latest revisions were so substantial that its application should be treated as a new rather than an amended application. The officer mentioned the change in law[28] that had occurred after the initial application's date, but concluded that the OWRB would have the ultimate say as to whether Aggregates could claim an exemption under the amended law, and that ODM's rules did not contemplate that certain amendments required an application be treated as new.

¶21 The officer therefore recommended the application be granted, conditioned, inter alia, on Aggregates either obtaining OWRB permits or providing "documentation" from OWRB that no permits were required before initiating any use of groundwater or surface water for mining activities. The permit as recommended would allow Aggregates to "truck" water in and out for construction and mining activities, but would prohibit Aggregates from initiating any mining activities outside the 15-acre area without first obtaining ODM's permission to do so after submitting a revised permit application with bond coverage and other required information. [29]

C. Second Notice of Departmental Decision

¶22 On September 19, 2013, ODM issued its second Notice of Departmental Decision (second NDD) conditionally granting the permit per the conference officer's recommendations.[30] The second NDD recites that notice of the decision was provided in accordance with "Title 45 Oklahoma Statutes, 2001 § 724(H)(6)."[31]

¶23 Despite ODM counsel's and the conference officer's representations (at the third IC) that ODM would send the second NDD to each of the approximately 200 people who had filed written protests, however, ODM in fact mailed the second NDD only to persons who were in attendance at the third IC. The agency also published notice of the decision in the local newspaper. [32] Even so, the second NDD triggered more than 130 written protests requesting a formal adjudicatory hearing on Aggregates' permit application.

IV. FORMAL AJUDICATORY HEARING

¶24 Following discovery and pretrial motions, the formal hearing occurred over two days in September 2014.[33] Aggregates presented evidence in favor of granting the permit, while CPASA, the U.S. Fish and Wildlife Service, the National Park Service, and Oklahomaranch.com, LLC (whose property is adjacent to the proposed mining site) presented opposing evidence. Among Aggregates' witnesses was a representative of the OWRB, Kent Wilkins, who testified that "at this time" the OWRB did not require a permit or anything further from Aggregates. On cross-examination, he stated that Aggregates previously withdrew two stream water permit applications, and that, since the mine was not yet in operation, there was "not a whole lot that we could review" of a water management plan that Aggregates had submitted in 2012.

¶25 In November and December 2014, CPASA and Aggregates submitted proposed findings of fact and conclusions of law.[34] In February 2015, the ODM hearing examiner issued proposed findings of fact, conclusions of law, and a recommendation that a conditional permit be granted pursuant to the terms of the second NDD. The examiner found that Aggregates had demonstrated that its non-coal surface mining plan was "feasible," that it had agreed to comply with the other conditions of the second NDD, and that the company currently was "in compliance with the statutory requirements" of the OWRB. CPASA thereafter filed numerous exceptions challenging the substance of the findings,[35] and the ODM Director requested briefs from the parties as to those exceptions.

V. FINAL ODM DECISION

A. Adoption of the Hearing Examiner's Report and Recommendations

¶26 In December 2015, ODM issued its final decision adopting and modifying the report and recommendation of the hearing examiner.[36] Although the order largely incorporated the recommendations of the hearing examiner, it modified and/or clarified the examiner's recommendations in a few significant ways, as discussed below.

B. Modifications and Clarifications of the Hearing Examiner's 
Report and Recommendations

1. OWRB's Jurisdiction Over Water Issues

¶27 The order confirmed that ODM "may rely on the Oklahoma Water Resources Board in its exercise of jurisdiction over water issues" as to whether Aggregates was in compliance or out of compliance with OWRB's regulatory requirements; and found that if OWRB notified ODM that Aggregates was out of compliance, then ODM would suspend Aggregates' permit until it demonstrated such compliance and "amend[ed] its ODM permit accordingly."[37] The order stated:

The rules promulgated by OWRB to implement SB 597 [82 O.S. § 1020.2] codified as 785:30-15-1 et seq., include provisions which address the water issues raised. [Aggregates] must comply with these rules and any requirements made by OWRB pursuant to SB 597. Before [Aggregates] initiates any use of groundwater from wells or use of surface water from area springs or streams for any mining activities, [Aggregates] must first obtain the applicable permit or permits, for groundwater or for surface water as the case may be, from the OWRB, and provide copies of such permits to ODM. If no OWRB permit is needed, documentation stating such must be provided to ODM. [Aggregates] may truck in water for its initial construction activities, initial mining activities, and other mining activities as long as the trucked in water is from an authorized source.

If the OWRB notifies ODM that [Aggregates] is out of compliance with any requirements of the OWRB, ODM will temporarily suspend the authority of [Aggregates] to conduct mining operations until such time as [Aggregates] demonstrates that it is in compliance with OWRB requirements and ODM will amend the mining permit to comply with any terms and conditions imposed by the OWRB.[38]

2. Incremental Bonding

¶28 The order agreed with CPASA that Aggregates had not complied with ODM regulation OAC 460:10-21-4(b)(2), and that ODM's grant of a permit was conditioned on Aggregates' compliance with that regulation. Among other things, the regulation requires that an applicant identify all property increments that eventually are proposed to be bonded on the application map.[39] The ODM order added findings of fact that Aggregates had chosen to bond the "proposed mining permit in increments," but had "submitted a permit application map showing only the initial [15-acre] increment to be bonded" rather than the 575 acres described in the application. The order also added a conclusion of law that Aggregates had "failed to satisfy" ODM regulations on incremental bonding. "Otherwise," it stated, Aggregates had submitted an "administratively complete and technically correct application for mining permit."[40]

3. Federal Wetlands Requirements

¶29 The order clarified that the permit was subject to Aggregates' compliance with federal wetlands requirements, and that Aggregates would be subject to an enforcement action by ODM if it fell out of compliance with those regulations.

4. Restriction to the Initial 15-acre Bonded Area

¶30 The order clarified that both the permit and ODM's finding of "feasibility" of the proposed mining operation, was limited to the initial, 15-acre phase of the mining operation. The order pointed out that the record reflected Aggregates' "initial phase of mining only covers 15 acres"; that both ODM's Deputy Director and Minerals Division Administrator had testified to feasibility with reference to a permit application that addressed only the 15-acre initial phase; and that the OWRB had testified to Aggregates' compliance with OWRB regulations on the same basis. Only after setting forth this explanation did the order find sufficient evidence to support the hearing examiner's recommendation to grant a conditional permit based on a determination of feasibility.[41] The order specifically restricted Aggregates "to the initial 15 acres so designated on the bonding area map until a revision is submitted and approved by ODM," and that "a revision to the permit to increase the bonded area will be required before initiating any mining activities in the permit area outside the initial 15-acre bonded area." [42]

5. Protection of Taxable Value of the Mining Site

¶31 The order interpreted ODM's duty to "protect and perpetuate the taxable value of property," set forth in 45 O.S. § 722, as applying only to property to be reclaimed as a result of being disturbed by a mining operation, and that the statute does not impose a duty on ODM to protect the value of property outside the mine site. As such, ODM rejected CPASA's contention that the duty set forth in § 722 extended to protecting the value of property surrounding the mined lands. It modified the hearing examiner's proposed order by adding to its conclusions of law that "ODM properly interprets 45 O.S. § 722 when it insures the reclamation of the mine site."[43]

6. Property Disputes Between Interested Parties

¶32 Finally, ODM refused to consider CPASA's argument, raised during the formal adjudicatory hearing but not addressed by the hearing examiner in his proposed order, that Aggregates' use of groundwater would lower the water table under adjoining owners' property and thereby deprive them of the use and benefit of a valuable property right. The ODM referred to OAC 460:10:11-5(d) and (e), which provide, respectively, that "nothing herein shall authorize [ODM] to adjudicate property disputes between any interested parties," and that upon receiving notice of such a dispute "from any reasonable source," ODM's review of any "pending application . . . shall be suspended until the Department receives notice that such dispute has been conclusively resolved." ODM found that "since ODM's review of the permit application was completed prior to" the second NDD, ODM was not aware of "the property right issue during its review of this permit application." Apparently, the agency concluded it therefore was not required to suspend further action on the permit. Confusingly, however, ODM also found that it had not been put "on notice" of any "declaratory action regarding this legal issue" filed by a party to the proceeding.[44]

VI. DISTRICT COURT REVIEW

¶33 In April 2016, CPASA alone petitioned for judicial review of the ODM decision by the Oklahoma County District Court. Aggregates intervened as a party respondent. Before the trial court, CPASA argued that ODM had violated principles of procedural due process in its notice procedures; that ODM had not provided the trial court with the full administrative record because it had not included certain records introduced during the first and second informal conferences;[45] and that ODM's grant of the permit was arbitrary and capricious in light of applicable law and the substantial evidence. CPASA also offered evidence that, since issuing its decision, ODM had allowed Aggregates to increase the mine's "footprint" from 15 acres to 575 acres without notifying any party, by accepting Aggregates' revised incremental bonding map, which lists a total of eight phases of mining over the larger area.

¶34 The district court found ODM's order was supported by substantial evidence and was not contrary to law. It denied CPASA's request to supplement the record with the IC records as well as evidence related to the permit revision, stating that the items were outside the administrative record. Although stating his "biggest concern"[46] was the adequacy of notice given by ODM "to people," the trial court upheld the ODM order. CPASA filed this appeal.

STANDARD OF REVIEW

¶35 Pursuant to the OMLRA, 45 O.S.2011 §§ 721 through 738, ODM decisions issuing or denying a non-coal mining permit are subject to judicial review under the Oklahoma Administrative Procedures Act (OAPA), 75 O.S.2011 & Supp. 2017 §§ 250 through 323.[47] Accordingly, a district court and this Court apply the same review standard to the administrative record. City of Tulsa v. State ex rel. Pub. Employees Relations Bd., 1998 OK 92, ¶ 12, 967 P.2d 1214. Under that standard:

An agency's order will be affirmed if the record contains substantial evidence in support of the facts upon which the decision is based and the order is otherwise free of error. Scott v. Oklahoma Secondary School Activities Ass'n, 2013 OK 84, 313 P.3d 891, 299 Ed. Law Rep. 233. The order is subject to reversal, however, if the appealing party's substantial rights were prejudiced because the agency's findings, inferences, conclusions or decisions were entered in excess of its statutory authority or jurisdiction, or were arbitrary, capricious, or clearly erroneous in view of the reliable, material, probative and substantial competent evidence. Id.; Oklahoma Dept. of Public Safety v. McCrady, 2007 OK 39, 176 P.3d 1194. An appellate court may not substitute its judgment for that of the agency on its factual determinations. McCrady, supra, at 1200-1201.

Agrawal v. Okla. Dep't of Labor, 2015 OK 67, ¶ 5, 364 P.3d 618; see also 75 O.S.2011 § 322.[48]

¶36 "Whether an individual's procedural due process rights have been violated is a question of constitutional fact which is reviewed de novo," and requires an "independent, non-deferential re-examination of the administrative agency's legal rulings." Pierce v. State ex rel. Dep't of Pub. Safety, 2014 OK 37, ¶ 7, 327 P.3d 530 (footnote omitted). We also generally review de novo other questions of law, such as a party's right to contest an administrative action, Dulaney v. Okla. State Dep't of Health, 1993 OK 113, ¶ 16, 868 P.2d 676, and with limited exceptions, interpretations of law resolved by the trial court or the agency in making its decision. In re Protest to Certificate of Title Brand Issued to AAAA Wrecker Serv., Inc., 2010 OK CIV APP 121, ¶ 10, 242 P.3d 578 (citing Samman v. Multiple Injury Trust Fund, 2001 OK 71, ¶ 8 and n.5, 33 P.3d 302). "An administrative agency's legal rulings are subject to an appellate court's plenary, independent and nondeferential reexamination." Matter of Dobson Tel. Co., 2017 OK CIV APP 16, ¶ 15, 392 P.3d 295 (approved for publication by the Oklahoma Supreme Court)(internal quotation marks omitted). As held in Dobson, this Court and the Oklahoma Supreme Court are "'the ultimate authority on the interpretation of the laws of this State. . . .'" Id. (quoting Robinson v. Fairview Fellowship Home for Senior Citizens, Inc., 2016 OK 42, ¶ 13, 371 P.3d 477 (footnote omitted)).

ANALYSIS

¶37 CPASA argues two basic propositions of error on appeal: (1) the procedures followed by ODM constituted a violation of due process warranting vacation of ODM's grant of the permit; and (2) ODM and the trial court committed reversible error because their decisions were based on an incomplete administrative record.

I. ODM'S ALLEGED VIOLATION OF PROCEDURAL DUE PROCESS

¶38 CPASA contends ODM has violated the due process rights of interested parties by failing to notify all parties by mail of the second NDD, thereby lessening the chance that interested persons would seek a formal adjudicatory hearing. It further contends ODM violated due process by failing to require Aggregates to publish notice of each amendment to Aggregates' permit application, including, most recently, Aggregates' filing of a completed incremental bonding map months after the formal hearing concluded. Finally, CPASA argues ODM's administrative process is procedurally defective in and of itself because it allows the agency to make a decision based on an informal conference, where the public is allowed only to comment but not cross-examine witnesses, present expert testimony, or formally challenge issues affecting private property rights.

A. Adequacy of the Procedure Followed as to ODM's Second NDD

¶39 ODM rules do not clearly require that mail notice of an NDD be given to all persons requesting or attending an IC. Public participation in ODM's consideration of non-mining permit applications is addressed at 45 O.S.2011 § 724 and ODM regulations, OAC 460:10-17-1 through 10-17-16. Section 724(G) prohibits ODM from issuing a permit "except upon proper application and public hearing, if requested." Pursuant to § 724(H)(1)(b), an applicant must publish notice "in a newspaper of general circulation in the vicinity of the mining operation" and include, inter alia, the following information:

(1) the name and business address of the applicant,
(2) a description which clearly shows or describes the precise location and boundaries of the proposed permit area and is sufficient to enable local residents to readily identify the proposed permit area. It may include towns, bodies of water, local landmarks, and any other information which would identify the location,
(3) the location where a copy of the application is available for public inspection,
(4) the name and address of the Department [of Mines] where written comments, objections, or requests for informal conferences on the application may be submitted . . . ,
. . . [and]
(6) such other information as is required by the Department.

1. ODM's Notice of the Second NDD

¶40 Title 45 O.S. § 724(H)(2), read in conjunction with the Court's opinion in Daffin, recognizes the right of any person whose interest might be adversely affected by a mining operation to submit comments or objections to a permit application, and to request a public hearing.[49] Section 724(H)(5) requires that, following the hearing, ODM "shall determine whether to issue or deny the permit, and shall notify all parties of its decision" (emphasis added).

¶41 ODM regulations make requirements similar to § 724(H)(2) with regard to informal conferences. Under OAC 460:10-17-6(a), "[a]ny person who resides [sic] or owns property that could be adversely affected" by a proposed operation may file "written objections to an initial or revised application." Under OAC 460:10-17-7(a)("Informal conferences"), any "person eligible under 460:10-17-6(a)" may request ODM to hold an informal conference, and under OAC 460:10-17-7(b) ODM may accept "relevant information from any party to the conference," with a stenographic or electronic record of the conference to remain accessible to "all parties" (emphasis added). ODM must "give its written findings . . . to the permit applicant and to each person who is a party to the conference" explaining the grounds for its decision. OAC 460:10-17-11(c)(emphasis added throughout). Then, "[w]ithin 30 days after an applicant or permittee is notified of [ODM's] decision, any person with an interest which is or may be adversely affected may request a hearing on the reasons for the decision." OAC 460:10-17-15(a).

¶42 Neither Title 45 nor ODM regulations define "party," but under the OAPA, which is equally applicable here, the definition of "party" is virtually the same as what mining law recognizes as a person entitled to participate and receive notice of an ODM decision following an informal conference: a "party" is any "person or agency named and participating, or properly seeking and entitled by law to participate, in an individual proceeding." 75 O.S. 2011 and Supp. 2017 § 250.3(12). In turn, an "individual proceeding" is "the formal process employed by an agency having jurisdiction by law to resolve issues of law or fact between parties and which results in the exercise of discretion of a judicial nature." 75 O.S. 2011 and Supp. 2017 § 250.3(8).[50]

¶43 Thus, even under ODM's own rules, any person actually named as a participant or any person who properly sought and was entitled to participate would have been entitled, as a "party," to receive each ODM conference officer's decision. To the extent that those persons were known to ODM and their addresses were available, ODM was obliged to notify them of its decision in the same manner that it notified Aggregates and CPASA of ODM's decision. To the extent it failed to do so, it erred.

¶44 Unfortunately, the record here is unclear as to which persons who in fact "properly sought and were entitled to participate" in the third IC did not receive by mail the second NDD. However, the record is very clear that ODM failed to follow through on its assurance that it would mail the second NDD to each of the approximately 200 people who claimed they were entitled to participate and whose names and addresses had been placed on the agency's mailing matrix. In its brief on appeal, ODM appears to seek to deflect responsibility for any error by describing itself as having a "limited role" in the administrative proceedings, and states that the private parties seeking to "adjudicate their respective interests" before ODM are the real parties in interest. This description misconstrues ODM's role and the important duties conferred on the agency by Oklahoma law to not only enforce coal and non-coal mining laws but also to assure that the environment is protected.

¶45 ODM is designated as both a "groundwater protection agency" and a "state environmental agency" by Oklahoma's Environmental Quality Act, 27A O.S.2011 §§ 1-1-201(5) and 1-1-201(13). As such, it is charged with, among other duties, implementing and enforcing the laws and rules under its areas of environmental responsibility. 27A O.S.2011 § 1-1-202 (A)(1). It is "the groundwater protection agency for activities within [ODM's] jurisdictional areas of environmental responsibility," and must "take such action as may be necessary to assure that activities within [ODM's] jurisdictional areas of environmental responsibility protect groundwater quality . . . ." 27A O.S.2011 § 1-1-202(C)(1) and (5). [51] The law authorizing ODM to issue mining permits also is clear in assigning ODM the function and duty to review and approve or deny permit applications, conduct public hearings, and keep records of such proceedings. ODM rules also state unambiguously that the rules are intended to establish only "the minimum requirements for public participation in the permit process." OAC 460:10-17-1 (emphasis added). Thus, if ODM, at a public conference or hearing called and conducted by ODM, represents that it will give notice of its decision in a particular manner to particular persons, it is incumbent on the agency to follow through on that representation. Accordingly, we find that ODM erred when it failed to abide by its representations regarding the second NDD.

2. Was Due Process Afforded Here?

¶46 However, our finding that ODM erred does not automatically mean that ODM violated the due process rights of parties affected by the error. A state agency's failure to follow its own procedure does not automatically equate to a due process violation. See e.g., Elliott v. Martinez, 675 F.3d 1241, 1247 (10th Cir. 2012); James v. Rowlands, 606 F.3d 646, 657 (9th Cir. 2010). "Our inquiry into whether an individual has been denied procedural due process is twofold. Initially we must determine whether the aggrieved individual possessed a protected interest to which due process protections apply," and, "[i]f the person does enjoy a safeguarded status, we then must assess whether the party was conferred with the appropriate level of process." In re T.T.S., 2015 OK 36, ¶ 14, 373 P.3d 1022.

¶47 Assuming arguendo that the parties whom CPASA contends were denied due process in fact possess a constitutionally protected interest,[52] the question for this Court then becomes whether the parties were nonetheless afforded an "appropriate level of process" under the circumstances presented. This question "must be determined on a case-by-case basis because the due process clause does not by itself mandate any particular form of procedure," but instead calls for such procedural protection "as the particular situation demands." In re A.M., 2000 OK 82, ¶ 9, 13 P.3d 484 (citing McLin v. Trimble, 1990 OK 74, 795 P.2d 1035, and Mathews v. Eldridge, 424 U.S. 319, 322, 96 S.Ct. 893 (1976)). In Daffin v. State ex rel. Okla. Dep't of Mines, the Court used the approach initially set forth in Mathews v. Eldridge, to evaluate the due process claim of the plaintiff in that case, calling the approach a "balancing test" requiring the consideration of three factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Daffin, 2011 OK 22 at ¶ 21 (quoting Mathews, 424 U.S. at 334-35). Ultimately, the Court said, "The state's interest must be balanced against the risk of unconstitutionally depriving a property owner of an opportunity to protect his interest" Id. ¶ 22.

¶48 In applying the factors here, it is important to note that CPASA's standing in this case derives from its status as an association whose members' interests may be adversely affected by the proposed mining operation. In response to challenges by ODM and Aggregates that CPASA lacks standing to raise due process on behalf of others, CPASA relies heavily on Oklahoma Education Ass'n v. State ex rel. Oklahoma Legislature, 2007 OK 30, ¶ 9, 158 P.3d 1058, where the Court recognized associational standing, as follows:

An association has standing to seek redress for injury on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

Id. ¶ 9 (quoting Okla. Pub. Employees Ass'n. v. Okla. Dept. of Cent. Serv., 2002 OK 71, ¶ 9, 55 P.3d 1072). Neither ODM nor Aggregates denies that CPASA has met these requirements.

¶49 We do not suggest that CPASA's associational standing deprives an association member of the right to receive personal notice to which they would otherwise be entitled. We do find, however, that the fact of CPASA's representation of its members' interests lessens considerably the risk of harm caused by ODM's failure to individually notify all persons who were entitled to such notice of the second NDD. CPASA has actively participated since the inception of this matter, and under the record presented, appears to have worked consistently to protect area groundwater both from an environmental standpoint as well as from the economic standpoint of its members.

¶50 Furthermore, CPASA has offered no evidence that any individual in fact was prevented from participating in the formal adjudicatory hearing due to lack of notice, nor is there evidence that any individual's reliance on ODM's prior representations as to mail notice resulted in any person failing to seek an adjudicatory hearing. The fact that more than 130 people actually filed written requests for a formal hearing suggests otherwise, and the only harm that CPASA has vocalized with regard to ODM's erroneous decision is that it lessened the likelihood that some unidentified persons would file a request for a formal adjudicatory hearing. In this respect, the situation presented here differs significantly from that presented in Dulaney v. Okla. State Dep't of Health, 1993 OK 113, 868 P.2d 676, and in Daffin, cases that each involved a named plaintiff who in fact had been denied participation in a proceeding.[53]

¶51 An inescapable factor here also is the restricted 15-acre area covered by the initial conditional permit approved by ODM. As discussed further below, ODM rules contemplate that interested parties will remain involved in the permit revision process and thus will continue to have opportunities to be heard at such time(s) as Aggregates seeks to revise its permit to expand its operation beyond 15 acres.

¶52 On the other hand, it is not difficult to imagine the significant fiscal and administrative burdens it would impose on ODM if we were to vacate its decision and require it to conduct corrected proceedings from the point of mailing notice of the second NDD to holding another formal hearing. Thus, overall, on balancing the various factors discussed above, we find the record shows that CPASA's members and those similarly situated have had their interests represented through the efforts of CPASA. We find that the process so far provided has been adequate to apprise interested and/or affected parties of ODM's decisions, and that no violation of due process resulted from ODM's failure to give notice as required by applicable statutes and the agency's own rules. Though our criticism serves as a guide for ODM prospectively in this and other such proceedings, we reject CPASA's contention that ODM's decision should be invalidated on this basis at this time.

B. Amendments to Aggregates' Application

1. Notice of Amendments

¶53 CPASA next contends its right of due process was violated when ODM failed to require Aggregates to republish notice each time it submitted an amendment to its pending application. CPASA does not cite authority to support the claim that an applicant must publish notice of each "amendment," no matter how trivial the amendment may be, to an initial application.

¶54 The statutory and regulatory requirements on this issue are unclear. The publication requirement under 45 O.S.2011 § 724(H) appears to apply only to an applicant's initial filing. ODM regulations concerning publication and public participation appear addressed to applications for initial and revised permits,[54] but not necessarily to amendments to a pending, initial permit application. See, e.g., OAC 460:10-17-6(a) (referring to the right to "file written objections to an initial or revised application for a permit . . . within 14 days after the last date of publication" of newspaper notice)(emphasis added); OAC 460:10-9-5(c)("Revision of Permits")(application for revision of permit to be filed before permittee may revise operations; ODM to determine time for review and for public participation); OAC 460:10-19-4 (permit revisions proposing operation changes or enlargements to permit area are subject to requirements of Subchapter 17). Aggregates and ODM assert in their briefs that ODM's practice is to require an applicant to republish an amendment to a pending permit application if the proposed amendment constitutes a significant or a substantial change to the application. There is no evidence that this practice was violated here. CPASA does not deny that it was aware of all amendments made by Aggregates prior to the December 2014 formal adjudicatory hearing, and the permit application with all amendments at all times was available for public inspection at ODM. We reject CPASA's argument on this point.

2. Aggregates' Incremental Bonding Map

¶55 CPASA's larger complaint concerns Aggregates' submission of a completed "incremental bonding map" to ODM in January 2016, more than a year after the formal adjudicatory hearing and nearly a month after ODM issued its decision. Because the submission occurred after the formal hearing, the district court considered that it was not a part of the administrative record and refused to address it. CPASA does not allege this refusal was error, but nonetheless argues that Aggregates improperly submitted the map without notice to all parties. The map is included in the record on appeal, and the parties devote considerable argument in their appellate briefs to its meaning and effect. Thus, even though error was not properly preserved, the issue clearly will remain unresolved on remand. We therefore address it for the benefit of the trial court, the parties and the agency.

¶56 CPASA describes the map as having "increased [Aggregates'] intended areas of mining" from 15 acres to 575 acres without notice to any party,[55] thus implying the map made a substantive revision to the permit area. Aggregates describes the map as its "phased bonding area" map, contends its "mining area has always been 575 acres," and claims it may "change the size of its bonded area without prior consent of ODM"[56] -- thereby also appearing to suggest that it has made, and may make, a change to the permit area without notice to anyone at any time. ODM, on the other hand, describes the map as submitted by Aggregates purely as a technical change in fulfillment of the condition described in the ODM decision. ODM also reiterates unequivocally that the map "did not increase the acreage of the permit," and "did not eliminate the 15-acre restriction" contained in the permit.

¶57 We agree with ODM's view of the amended map as the fulfillment of a condition of Aggregates' permit, which remains restricted to a 15-acre operational area regardless of Aggregates' post-hearing fulfillment of a technical requirement regarding content required in an initial permit application. As discussed above, ODM agreed with CPASA that Aggregates had not complied with ODM rules requiring that a complete incremental bonding map be included with its initial application. ODM thus imposed the submission of such a map as a condition of the 15-acre-area permit. To the extent that Aggregates suggests it may change the operational area of its permit without submitting a revised permit application, complying with notice and public comment procedures, and obtaining ODM approval, however, it is in error. The latter view is contradicted both by the factual basis for that order and by the specific restrictions set forth in the ODM order under review here. The order clearly limits Aggregates "to the initial 15 acres so designated on the bonding area map until a revision is submitted and approved by ODM," and that "a revision to the permit to increase the bonded area will be required before initiating any mining activities in the permit area outside the initial 15-acre bonded area" (emphasis added).

¶58 As discussed above, ODM rules concerning revisions to non-coal surface mining permits generally impose notice and hearing requirements similar to those applicable to an initial permit application. See, e.g., OAC 460:10-17-6(a); OAC 460:10-9-5(c)("Revision of Permits"); and OAC 460:10-19-4. Accordingly, future applications by Aggregates to revise its permit beyond the restrictions imposed by the ODM order will be subject to ODM oversight and approval.[57]

C. ODM's Administrative Process

1. Constitutionality of ODM's Informal Conference Process

¶59 CPASA next attacks ODM's administrative process as constitutionally deficient, in and of itself, because it allows the agency to base its initial decision whether to grant or deny a permit on an informal conference, where the public may comment but may not cross-examine witnesses, present expert testimony, or formally challenge issues that affect property interests. CPASA claims that ODM's permitting procedure -- which allows interested parties to first request an informal conference and then to seek a formal hearing if desired -- does not afford a meaningful opportunity for public participation prior to ODM's decision. Again, however, CPASA cites no authority aside from Daffin to support this proposition of error.

¶60 We find CPASA's reliance on Daffin is misplaced in this context. As discussed above, the Court in Daffin dealt only with the adequacy of the informal conference procedure from the standpoint of whether its denial of an interested property owner's right to be heard at an informal conference was constitutional. The Court did not strike down the agency's two-tiered system of turning first to an informal conference to gather public input and possibly resolve disputes before requiring a full-blown formal adjudicatory permit hearing. In addition, although the "decision" made by ODM following an informal conference may eventually lead to a permit, as ODM states in its brief, no permit will issue until the time to request a formal hearing has elapsed. If a formal hearing is requested, a final decision is not made until after that hearing, in a de novo proceeding at which all parties may call/cross-examine witnesses, present expert testimony, and raise any issues presented by the evidence. Daffin assured that any person who is entitled to request a formal hearing is also entitled to request and comment on a proposed permit at the informal conference. The Court did not criticize the ODM administrative hearing structure in and of itself, however.

¶61 The informal conference procedure used by ODM may be grouped within a broader category of agency procedures known as "informal adjudication." Informal adjudication is used in a wide variety of state and federal agency actions, and has been described as "about 90 percent of what the government does with respect to the individual," as well as "'truly the life blood of the administrative process.'" Verkuil, Paul R., "A Study of Informal Adjudication Procedures," 43 U. Chi. L. Rev. 739, 741, 744 (1976). Though originally written about federal agencies' informal administrative procedures, the following comment applies equally to informal procedures often used by state agencies:

Informal adjudication procedures depart from the formal adjudicatory model in many respects. Subject to possible constraints imposed by due process, informal adjudication may include informal conferences, ex parte contacts, active involvement by the decisionmaker in the investigation and prosecution of the agency's case . . . limited evidentiary requirements, and generally a relaxation of the formalities associated with formal adjudication. There also may be no provision for confrontation of evidence and witnesses, and there may be no discovery . . . .

R. Levin, Preface, 54 Admin. L. Rev. 1, 29-30 (2002)(including an excerpt from "A Blackletter Statement of Federal Administrative Law," prepared by the American Bar Association's Section of Administrative Law and Regulatory Practice). In light of comments such as these, CPASA's implication of irregularity by ODM due to its use of informal procedures to obtain public input is unwarranted.

2. ODM's Formal Hearing Process

¶62 We also find the record does not support CPASA's assertion that, during the formal hearing, ODM refused to consider any issues that were not first raised at an informal conference. However, we find that the example CPASA has cited to illustrate its argument on this point is well taken. ODM erred as a matter of law and needlessly confused the issues by stating in its final order that the agency's "review of the permit application was completed prior to" the second NDD, and the agency had "no notice of the property rights issue" before that time, thereby suggesting, wrongly, (1) that the agency's review of the application was no longer "pending" at the time of the formal hearing,[58] and (2) that area property owners who have a "property dispute" but do not put ODM on notice of it prior to an NDD, may not later raise it before the permit is issued.

¶63 In its brief on appeal, ODM takes a position contrary to its own order, arguing that a permit application remains pending, with no permit issued, until the agency issues its final decision (following a formal hearing if the case has gone to a formal hearing). ODM also appears to recognize that its refusal to take evidence on a property dispute cannot preclude property owners from seeking to adjudicate groundwater property rights in an appropriate forum as a matter of law. Consequently, we find the affected portion of ODM's decision on this issue should be and hereby is vacated, and the order is modified accordingly.[59]

¶64 As a final note on this issue, we find no evidence that CPASA raised a legitimate "property dispute" before ODM other than the otherwise unsupported testimony of area property owners that they feared their domestic groundwater use might be compromised if ODM granted the permit. ODM has discretion to determine what constitutes a "reasonable source" of information of a property dispute within the meaning of the applicable regulatory provisions (OAC 460: 10-11-5(d) and (e)). In light of the fact that the permit as granted allows no groundwater to be taken, CPASA's assertion that the property owners' groundwater rights are currently endangered appears virtually impossible.

II. THE ADMINISTRATIVE RECORD BEFORE THE DISTRICT COURT

A. ODM's Administrative Record

¶65 In its final argument, CPASA claims reversible error occurred because ODM failed to include in the administrative record certain materials that the agency considered in making its decision. The materials are described generally in CPASA's brief as including written comments by public participants and other documents accepted by ODM at the three informal conferences. Although written transcripts of all three ICs were included by ODM in the administrative record, ODM admits that some of the written materials it received at those conferences were not included. Those materials apparently also were not described by any party in the pre-trial conference order or introduced for admission at the formal adjudicatory hearing. ODM and Aggregates contend the administrative record properly consists only of evidence introduced at the formal adjudicatory proceeding. They argue, in essence, that CPASA failed to preserve the disputed materials as part of the administrative record when it did not list them in the pre-trial conference order for the formal hearing or seek admission of them at the formal hearing.[60] However, ODM and Aggregates cite no agency rule, state statute, or case law that limits judicial review of an agency decision to only the materials presented as part of the formal adjudicatory hearing when informal adjudication has also occurred.

¶66 Pursuant to the OAPA, 75 O.S.2011 § 309(F), the administrative record in an individual proceeding "shall include" the following:

1. All pleadings, motions and intermediate rulings;
2. Evidence received or considered at the individual proceeding;
3. A statement of matters officially noticed;
4. Questions and offers of proof, objections, and rulings thereon;
5. Proposed findings and exceptions;
6. Any decision, opinion, or report by the officer presiding at the hearing; and
7. All other evidence or data submitted to the hearing examiner or administrative head in connection with their consideration of the case provided all parties have had access to such evidence.
(Emphasis added).

¶67 When a petition seeking judicial review is filed, the agency conducting the proceeding bears responsibility for compiling and transmitting the administrative record to the reviewing court. OAPA § 320; Edwards v. Okla. Employment Sec. Comm'n, 1997 OK CIV APP 87, ¶ 7, 953 P.2d 64. Pursuant to OAPA § 321, judicial review is confined to the administrative record, except "in cases of alleged irregularities in procedure before the agency, not shown in the record, testimony thereon may be taken in the reviewing court." Also relevant here is OAPA § 322, providing that a ground for reversal or modification of an agency order is an appellate court finding that "the substantial rights of the appellant or petitioner . . . have been prejudiced" because the agency decision is "clearly erroneous . . . upon examination and consideration of the entire record as submitted."

B. CPASA'S Supplemented Record in District Court

¶68 The appellate record designated by the parties to this Court includes a computer disk, labeled "CPASA's Supplement to the Record Case No. CV-2016-716, EX 1." It contains approximately 4,000 pages of documents and apparently was what the district court refused to consider because ODM had not included it in the administrative record.

¶69 As a general rule, a court reviewing an agency order must review "the full administrative record" that was before the agency at the time it made its decision. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419-20, 91 S. Ct. 814, 525-6 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97 S. Ct. 980 (1977). Similar language is echoed in the OAPA's reference to the record as including all "evidence or data submitted" to the agency "in connection with [its] consideration" of the matter, and to "the entire record submitted." We find nothing in case law or other authority holding that an agency's administrative record is limited to the record made of the formal administrative hearing just because there have also been informal conferences and public meetings held as part of the agency's deliberative process.

¶70 In fact, as noted in the factual review above, ODM's informal conference officers told participants that the conferences allowed the agency to consider public opinion and help ODM to "make the right decision." They also referred to "holding the record open" after the end of a conference so that participants could submit additional materials for consideration. ODM admits in its brief on appeal that "results of an informal conference are a required portion of ODM's review and form a part of the basis upon which ODM makes its decision on the application."[61] Moreover, the importance of the informal conference to ODM decision-making was clearly recognized by the Oklahoma Supreme Court in the Daffin opinion, 2011 OK 22, 251 P.3d 741, discussed at length above.

¶71 Therefore, we reject ODM and Aggregates' contention that only materials that were listed on the pre-trial order or offered or admitted into evidence at the formal adjudicatory hearing were properly included in the administrative record submitted for judicial review. ODM therefore erred in omitting the materials solely for the reason that it did.

¶72 At the same time, however, we recognize that supplementing the administrative record, after a matter has been submitted to a court for review, should not be necessary as a matter of course. The following passage from the case of American Petroleum Tankers Parent, LLC v. United States, 952 F. SupP.2d 252, 261 (D.D.C. 2013), is both well-stated and instructive:

Supplementation of the administrative record is the exception, not the rule. . . . This is because an agency is entitled to a strong presumption of regularity, that it properly designated the administrative record. . . . The rationale for this rule derives from a commonsense understanding of the court's functional role in the administrative state . . . Were courts cavalierly to supplement the record, they would be tempted to second-guess agency decisions in the belief that they were better informed than the administrators empowered by Congress and appointed by the President. . . . However, an agency "may not skew the record by excluding unfavorable information but must produce the full record that was before the agency at the time the decision was made. . . . The agency may not exclude information from the record simply because it did not rely on the excluded information in its final decision. . . . Rather, a complete administrative record should include all materials that might have influenced the agency's decision[.]

Id. at 261 (citations and internal quotation marks omitted).

C. Harmless Error and Lack of Prejudice

¶73 As noted above, CPASA submitted a computer disk containing approximately 4,000 pages of materials as part of its request to supplement the administrative record. It did not specifically identify any document or other data as being particularly relevant to judicial review, nor does CPASA delineate, now, how it was substantially prejudiced by ODM's failure to include these documents in the administrative record. In fact, CPASA does not argue in this Court that the agency decision is unsupported by the evidence; rather, it argues that procedural deficiencies and mistakes committed by ODM warrant reversal as a matter of law.

¶74 Thus, while we agree with CPASA that ODM improperly limited the record to only those items from the formal hearing, we nonetheless find that CPASA has not demonstrated how it was substantially prejudiced by ODM excluding the materials, or even how those items are relevant to this Court's review of ODM's decision. In other words, CPASA has not argued that the excluded materials would have changed the lower court's decision. Inasmuch as only a 15-acre operational area has been approved with no surface or groundwater use at this point, it appears unlikely that the excluded materials would have made such a difference, since the paramount concern to CPASA throughout these proceedings has been protecting the volume and quality of area surface and groundwater.

¶75 We decline to reverse the trial court's decision in order to require it to reconsider its decision in view of the materials that ODM should have included in the administrative record. Although we agree with CPASA that both the trial court and the agency erred as to this issue, we are constrained to find the error harmless at this point in the proceedings. We reject CPASA's contention that ODM's order should be reversed on this ground at this time, but caution ODM that "a complete administrative record should include all materials that might have influenced the agency's decision," id., even if those materials were not necessarily supportive of the decision, in fact, particularly if they are not supportive of the decision.

CONCLUSION

¶76 As modified, we affirm ODM's order approving a conditional permit to mine an area currently limited to 15 acres. We note the opportunity for error in this case was exacerbated by ODM's inconsistent interpretation and application of its own rules, and by Aggregates' repeated amendments to its permit application, to what end still remains unclear. We remand to ODM with instructions to comply, prospectively, with the notice, hearing, and administrative record compilation procedures that we have described herein.

¶77 AFFIRMED AS MODIFIED, REMANDED WITH INSTRUCTIONS.

WISEMAN, P.J., and FISCHER, J., concur.

FOOTNOTES

[1] [Admin Record (AR) vol. 9 at pp. 3560+].

[2] [Testimony by Peter Dawson, Aggregates' president. Transcript of Sept. 19-20, 2014 adjudicatory hearing, pp. 43-58; AR vol. 5 at pp. 1973--1988].

[3] [Testimony by Geoffry Canty, Aggregates' consultant, at Sept. 19-20 adjudicatory hearing, Transcript pages 400-445, AR vol. 6 at pp. 2384-2429; Proposed Report and Order of Hearing Examiner, dated Feb. 11, 2015, at p. 10, AR vol. 7 at p. 2942].

[4] [AR vol. 14 at p. 4205; transcript (TR) at p. 2].

[5] [AR vol. 14 at p. 4205].

[6] [Affidavit of Publication, AR vol. 11 at p. 3953].

[7] [AR vol. 11 at p. 3953].

[8] The conference officer stated:

[I]f you've signed in tonight and you are a qualified protester, you will receive a copy of the notice of decision. If you are not -- if you are not and you're also -- now, we now publish our decisions in the -- in the paper, local paper, so it will also be published. . . . And this one will be in the Johnston County Capital-Democrat [like] everything else has been. What the -- basically what the decision will say, it will say what . . .our decision is and it will also inform you if you wanted to ask for administrative hearing, it will give you the . . . time frames for such.

[TR of 10/4/2011, AR vol. 14 at pp. 4255-4256]. Later in the hearing, he stated that anyone signing in at either of the conferences would receive a copy of the NDD, and it would also be published in the newspaper. [Tr. of 10/4/2011, AR vol. 14 at p. 4263]. Still later, he said "everyone who was a qualified objector in the December 2, 2010 informal conference and the October 4, 2011 informal conference that are qualified will receive a copy of that notice of decision," and "[i]f you are not a qualified objector, you will still get notice through the paper." [TR of 10/4/2011, AR vol. 14 at pp. 4311-12].

[9] [TR of 10/4/2011, AR vol. 14 pp. 4262-63].

[10] [AR vol. 14 p. 4265].

[11] [AR vol. 14 pp. 4265-66].

[12] "Findings of the Conference Officer" at AR vol. 16 pp. 4434-4459, which formed the basis for the ODM's first NDD, issued 11/14/11, at AR vol. 16 p. 4460.

[13] [AR vol. 16 p. 4453]. "OAC" refers to Oklahoma Administrative Code.

[14] [AR vol. 16 p. 4460].

[15] [AR vol. 16 pp. 4457-59].

[16] In June 2012 and November 2012, Aggregates had submitted to ODM two revised outlines of proposed water management and conservation plans. These documents stated that Aggregates was exempt from groundwater protection requirements of 82 O.S.2011 § 1020.2 due to the date its application was submitted; and that OWRB had not yet approved two surface water permits for which Aggregates had applied but that those permits were not necessary for the initial phases of Aggregates' operation. [AR vol.11 at p. 3954-56; 3978-80]. The November outline also noted, "Water rights may be added or deleted over time as the quarry develops." Id. at 3979.

[17] See e.g., AR vol. 14 at pp. 4330-31 (pp. 65-66 of the Transcript of the April 2, 2013 informal conference); and "Findings of the Conference Officer" dated 9/4/13 at Part V(D) [AR vol. 16 p. 4463].

[18] [Findings of Conference Officer d. 9/4/2013, AR vol. 16 at p. 4463 (Part V, Summary of Proceedings, finding (E)].

[19] [Affidavit of Publication, AR vol. 13 at pp. 4146-4149].

[20] [AR vol. 14 at p. 4315].

[21] At AR vol. 14 at p. 4331 (pp. 67-69 of the Transcript of the April 2, 2013 informal conference), the following exchange occurred among ODM Conference Officer Dean Couch, ODM General Counsel Mark Secrest, and protestants appearing at the conference:

MR. SEACREST [sic]: But -- but we haven't made a decision yet, so, you know, you can't have a formal hearing until the department makes a decision. Now, once we make a decision, everybody on that matrix, the 182 I think that we mailed out, will be given notice of that decision and then there would be an ad run in the local newspaper of what that decision is. Anybody who might be adversely affected -- and this is a direct quote from the statute -- has a right to request a formal hearing. Could be the operator if we deny this thing or if we had conditions on it. They appealed it the first time.

* * *

MR. COUCH: Now . . . just to clarify that point . . .to the extent there is a new or separate formal hearing requested by those adversely affected . . . . I think the clarification is now the more than 200 or so will get notice -- even though they're not here today, didn't sign in, may not have even objected for today's proceeding -- will get notice of the recommendation and decision by the Department of Mines. (Emphasis added).

[22] [See AR vol. 14 at, for example, pp. 4325 and 4329-4331].

[23] Pursuant to 82 O.S.2011 § 1020.2(C)(3), except for subsection (E), the requirements of § 1020.2 do not apply to the taking, using or disposal of water trapped in producing mines that "overlie a sensitive sole source groundwater basin or subbasin for which an initial application for a permit shall have been filed with the [ODM] as of August 1, 2011 . . . ." None of the parties dispute that Aggregates is in compliance with this statute at this time.

[24] [AR vol. 16, pp. 4461-4474].

[25] [AR vol. 16, p. 4468-69, at Part VIII(A)].

[26] ODM required a bond of $1,500 per acre, meaning the 15-acre area required a bond of $22,500.

[27] [AR vol. 16 at pp. 4470-71].

[28] The reference is to 82 O.S.2011 § 1020.2, discussed at note 23 supra. As noted in the conference officer's findings, although the state legislature amended state groundwater law in 2003 to protect "sensitive sole source groundwater basins and subbasins," see 82 O.S.2011 §§ 1020.9, 1020.9A, and 1020.9B, until further amendments became effective in August 2011, see 82 O.S.2011 § 1020.2, "the taking, use and disposal of water trapped in producing mines was generally exempt from . . . Oklahoma Groundwater Law." [AR vol. 16 at p. 4473]

[29] The conference officer stated, "Since the applicant has elected to bond the location in phases and has outlined phase I but has yet to determine the incremental movement through the permit area, a revision to the permit to increase the bonded area will be required." [AR vol. 16 at p. 4474] (emphasis added). During argument in district court, ODM counsel cautioned the trial court against using the word "revision" as to a pending permit application, stating that the term "[a]mended would be a better word. Because a revision, in our lingo, connotates [sic] that the permit's been issued. . . . And so an applicant has the right to make some modifications to their permit application while it's pending . . . ." [Tr. of 1/20/17 at p. 13 ROA p. 1156]. Although ODM does not refer to a statute or ODM rule that expressly specifies such a distinction, ODM's brief on appeal and the agency's rules appear generally consistent in following this usage. The distinction is important in light of the fact that ODM's decision to conditionally grant the permit at this point clearly is based on its evaluation of the feasibility only of a 15-acre operation, and includes the further condition that Aggregates must file a revised permit application in order to expand the operation to additional acreage.

[30] [AR vol. 16 at pp. 4475-76].

[31] The 2001 version of § 724 does not contain a subsection (H)(6). However, ODM likely is referring to 45 O.S.2011 § 724(H)(5), which states, "Upon completion of findings after the [public] hearing, the Department shall determine whether to issue or deny the permit, and shall notify all parties of its decision." This provision is identical to subsection (G)(5) in the 2001 version of 45 O.S. § 724. In May 2008, § 724(G)(5) was renumbered as § 724(H)(5). Current § 724(H)(6) does not address notice, but provides, "Any decision regarding the issuance of a permit under this section shall be appealable when entered, as provided in the Administrative Procedures Act."

[32] See ODM Response Brief on Appeal at p. 3 and AR vol. 2 at p. 430, containing an email from ODM counsel to CPASA counsel stating that the second NDD was mailed only to "qualified protestants who attended and signed in" for the third informal conference, although ODM "did run an ad in the Johnston County Capital-Democrat notifying the public of the Second Departmental Decision." Curiously, the rationale cited in the email for restricting notice to only those in attendance is that Aggregates "began a new proceeding" when it "reran" its publication notice as an advertisement in January-February 2013 concerning its updated permit application. [AR vol. 2 at pp. 430-31].

[33] [Transcripts at AR vol. 5 at pp. 1931-2301 and vol. 6 at pp. 2302-2472; with duplicates located at AR vol. 18 at pp. 4685-5055 and vol. 19 at pp. 5056-5226].

[34] [See AR vol. 7 at pp. 2861-2895 (CPASA's proposed findings); AR vol. 7 at pp. 2896-2948 (Aggregates' proposed findings)]. On November 14, 2014, the U.S. Fish and Wildlife Service and National Park Service filed a "Joint Dismissal With Prejudice" of the entities' objections to Aggregates' mining permit. [AR vol. 6 at pp. 2476-2478].

[35] [See AR vol 7 at pp. 2949--2959].

[36] [AR vol. 7 at pp. 3257-3292].

[37] [AR vol. 7 at pp. 3274-75 and 3289-90].

[38] [AR vol. 7 at pp. 3290-91]. Although neither CPASA nor Aggregates challenges this finding, it is clear from ODM's language that ODM does not purport to assert that it has jurisdiction to require OWRB to function in a capacity whereby OWRB became answerable to ODM in performing OWRB's duties. How this particular provision will work as a practical matter is unclear, however, as there appears to be no statutory or regulatory provision requiring OWRB to notify ODM of violations of OWRB regulations; nor are we aware of an inter-agency agreement between OWRB and ODM containing such a provision.

[39] OAC 460:10-21-4(b) states, in pertinent part:

(2) When the operator elects to "increment" the amount of the performance bond during the term of the permit, he shall identify the initial and successive incremental areas for bonding on the permit application map submitted for approval as provided in Subchapter 17 of this Chapter and shall specify the proportion of the total bond amount required for the term of the permit which will be filed prior to commencing operations on each incremental area. The schedule amount of each performance bond increment shall be filed with the Department at least 45 days prior to the commencement of non-coal surface mining and reclamation operations in the next incremental area.

[40] [AR vol. 7 at pp. 3284 and 3289].

[41] [See AR vol. 7 at pp. 3278-79; ODM Order at ¶ 5, pp. 22-23, stating that ODM's "regulations require the Department to find that the permit, based on information set forth in the application or other information available, is accurate, complete, and that the applicant has demonstrated that the mining and reclamation operations as required by the Act can be feasibly accomplished." (citing OAC 460: 10-17-10)(emphasis added), and that "the record reflects that [Aggregates'] initial phase of mining only covers 15 acres."]

[42] This provision, along with the ODM condition that Aggregates submit a completed incremental bonding map, is further discussed in the Analysis section at Part I.B.

[43] [AR vol. 7 at p. 3289, ODM order at p. 32]. Section 722 contains the legislative "Declaration of policy" for the OMLRA, as follows:

It is hereby declared to be the policy of this state to provide for the reclamation and conservation of land subjected to surface disturbance by mining and thereby to preserve natural resources, to encourage the productive use of such lands after mining, to aid in the protection of wildlife and aquatic resources, to encourage the planting of trees, grasses and other vegetation, to establish recreational, home and industrial sites, to protect and perpetuate the taxable value of property, to aid in the prevention of erosion, landslides, floods and the pollution of waters and air, to protect the natural beauty and aesthetic values in the affected areas of this state, and to protect and promote the health, safety and general welfare of the people of this state. (Emphasis added).

[44] [AR vol. 7 at p. 3276].

[45] During the course of the district court proceedings, it also became apparent that a number of documents that were favorable to CPASA's argument and had been introduced during the formal administrative hearing had been omitted from the administrative record. The court entered an agreed order supplementing the administrative record with these items.

[46] [1/20/17 Transcript of motion hearing, at p. 50].

[47] See also OAC 460:3-1-5 ("Conducting hearings for formal review") and 460:10-17-16 ("Judicial review").

[48] Section 322 provides that an appellate court may set aside or modify an agency order, or remand the matter to the agency for further proceedings "if it determines that the substantial rights of the appellant or petitioner for review have been prejudiced because the agency findings, inferences, conclusions or decisions, are:

(a) in violation of constitutional provisions; or
(b) in excess of the statutory authority or jurisdiction of the agency; or
(c) made upon unlawful procedure; or
(d) affected by other error of law; or
(e) clearly erroneous in view of the reliable, material, probative and substantial competent evidence, as defined in Section 10 of this act, including matters properly noticed by the agency upon examination and consideration of the entire record as submitted; but without otherwise substituting its judgment as to the weight of the evidence for that of the agency on question of fact; or
(f) arbitrary or capricious; or
(g) because findings of fact, upon issues essential to the decision were not made although requested.

75 O.S.2011 § 322(1) (footnote omitted).

[49] See ODM's Brief on Appeal at p. 6, note 2, stating that "currently, any person has the right to request an informal conference" (emphasis added). As written, 45 O.S.2011 § 724(H)(2) states that only "property owners and residents of occupied dwellings who may be adversely affected located within one (1) mile" of a proposed mining site have the right to protest and request a public hearing. The Supreme Court struck down this provision as unconstitutional in Daffin v. State ex rel. Okla. Dep't of Mines, 2011 OK 22, 251 P.3d 741. In that case, a property owner who lived outside the one-mile limit was prohibited from commenting at an informal conference. He sued ODM, seeking a ruling that the one-mile limitation was unconstitutional. The Court held that § 724(H)(2) and ODM rules that incorporated the statutory language violated the owner's right of due process. In addition to depriving the property owner of a chance to participate in an informal conference, the Court also found it significant that under ODM rules, only the permit applicant and "part(ies) to the conference," i.e., those allowed to participate in the conference, would be "personally notified" of ODM's decision on the permit and then have 30 days to seek a formal hearing on the decision. Id. ¶ 13.

[50] Although ODM initially employed informal conferences as part of the permitting process here, those conferences were nonetheless a part of the entire "individual proceeding" concerning Aggregates' permit application by which ODM aimed to resolve issues surrounding the application. In fact, the OAPA itself suggests that an informal procedure may be employed as part of an "individual proceeding," for example in 75 O.S.2011 § 309(E), which states, "Unless precluded by law, informal disposition may be made of any individual proceeding by stipulation, agreed settlement, consent order, or default."

[51] ODM's jurisdictional areas of environmental responsibility are described at 27A O.S. Supp. 2017 § 1-3-101(G), as follows:

The Department of Mines shall have the following jurisdictional areas of environmental responsibility:
1. Mining regulation;
2. Mining reclamation of active mines;
3. Groundwater protection for activities subject to the jurisdictional areas of environmental responsibility of the Commission; and
4. Development and promulgation of a Water Quality Standards Implementation Plan pursuant to Section 1-1-202 of this title for its jurisdictional areas of responsibility.

[52] Neither ODM nor Aggregates denies that individuals who may be adversely affected by the mining operation have a protected interest at stake. Recognition of such a protected property interest also was implicit in the Court's opinion in Daffin, 2011 OK 22, 251 P.3d 741.

[53] In Dulaney, the Supreme Court affirmed a trial court holding that the landfill permit process used by the Oklahoma State Department of Health (OSDH) was invalid because OSDH rules did not identify the parties who should be notified and allowed to contest the granting of a landfill permit in an individual proceeding conducted under the OAPA. Since Dulaney, the permitting process for landfill permits, including its notice provisions, have changed numerous times. Provisions regarding landfills are now found under the Solid Waste Management Act, 27A O.S. Supp.1993 § 2--10--101 et seq., specifically, 27A O.S. Supp.1993 § 2--10--301, with permitting regulated under the Oklahoma Uniform Environmental Permitting Act, 27A O.S.2011 §§ 2--14--101 through 2--14--401, under the broader umbrella of the Oklahoma Environmental Quality Code, found at 27A O.S. Supp.1993 § 2--1--101, et seq. DEQ rules now require that applicants for a landfill permit "provide notice by certified mail, return receipt requested, to owners of mineral interests and to adjacent landowners whose property may be substantially affected by installation of a landfill site." OAC 252:4-7-13.

[54] See the discussion at footnote 29 above concerning ODM's practice of distinguishing between "amendments" to a permit application versus "revisions" to a granted permit.

[55] CPASA Brief in Chief at p. 6.

[56] Aggregates' Brief in Chief at p. 25.

[57] We further note that Aggregates' statement that it need not obtain ODM approval for bonding area changes is not supported by the ODM rule that it cites, OAC 460:10-23-5, which deals with adjustments to the amount of performance bond liability.

[58] ODM relied on OAC 460:10-11-5(d) and (e), which provide, respectively, that "nothing herein shall authorize [ODM] to adjudicate property disputes between any interested parties," and that upon receiving notice of such a dispute "from any reasonable source," ODM's review of any "pending application . . . shall be suspended until the Department receives notice that such dispute has been conclusively resolved."

[59] The language in question, comprised of the first six sentences of the first full paragraph on page 20 of ODM's December 15, 2015, order (ODM Record Bates Stamp #3276), is hereby vacated and the order is modified accordingly. The vacated language is as follows:

I note that while water issues have been raised throughout the informal and formal proceedings regarding this permit application, these issues have dealt with quality, quantity and the jurisdiction to resolve those issues. In reviewing the pretrial order in this case, the issue of groundwater as a property right was not raised by the parties. Since ODM's review of the permit application was completed prior to NDD 2, ODM had no notice of the property right issue during its review of this permit application. I would further note that CPASA's counsel argued during the oral arguments that ODM should file a declaratory action in District Court to resolve this issue (Oral Arguments Transcript, p. 24), then argued it was AA's responsibility to have filed such action (Oral Arguments Transcript, p. 98). Since ODM does not have jurisdiction over this issue, it would not be the proper party to have initiated such legal action. Whether AA or one or more of the Protestants should have initiated this legal action is not for ODM to determine.

[60] As noted above in our discussion of the facts, the trial court denied CPASA's motion to supplement the record with the materials. The court granted the motion with respect to certain other documents that had been admitted at the formal hearing after ODM agreed that the latter materials had inadvertently been excluded from the record it transmitted to the district court.

[61] ODM Brief in Chief at p. 6.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2010 OK CIV APP 121, 242 P.3d 578, AAAA WRECKER SERVICE, INC. v. OKLAHOMA TAX COMMISSION
Discussed
 2017 OK CIV APP 16, 392 P.3d 295, DOBSON TELEPHONE CO. v. STATE ex rel. OKLA. CORPORATION COMM.
Discussed
 1997 OK CIV APP 87, 953 P.2d 64, 69 OBJ 155, EDWARDS v. OKLAHOMA EMPLOYMENT SECURITY COMMISSION
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1990 OK 74, 795 P.2d 1035, 61 OBJ 1633, McLin v. Trimble
Discussed
 1993 OK 113, 868 P.2d 676, 4 OBJ 2845, DuLaney v. Oklahoma State Dept. of Health
Discussed at Length
 2001 OK 71, 33 P.3d 302, 72 OBJ 2703, SAMMAN v. MULTIPLE INJURY TRUST FUND
Discussed
 2002 OK 71, 55 P.3d 1072, OKLAHOMA PUBLIC EMPLOYEES ASSOCIATION v. OKLAHOMA DEPT. OF CENTRAL SERVICES
Discussed
 2007 OK 30, 158 P.3d 1058, OKLAHOMA EDUCATION ASSOCIATION v. STATE ex rel. OKLAHOMA LEGISLATURE
Discussed
 2007 OK 39, 176 P.3d 1194, OKLAHOMA DEPARTMENT OF PUBLIC SAFETY v. McCRADY
Discussed
 2011 OK 22, 251 P.3d 741, DAFFIN v. STATE ex rel. OKLAHOMA DEPT. OF MINES
Discussed at Length
 2013 OK 84, 313 P.3d 891, SCOTT v. OKLAHOMA SECONDARY SCHOOL ACTIVITIES ASSOCIATION
Discussed
 2014 OK 37, 327 P.3d 530, PIERCE v. STATE ex rel. DEPT. OF PUBLIC SAFETY
Discussed
 2015 OK 36, 373 P.3d 1022, IN THE MATTER OF T.T.S.
Discussed
 2015 OK 67, 364 P.3d 618, AGRAWAL v. OKLAHOMA DEPT. OF LABOR
Discussed
 2016 OK 42, 371 P.3d 477, ROBINSON v. FAIRVIEW FELLOWSHIP HOME FOR SENIOR CITIZENS, INC.
Discussed
 2000 OK 82, 13 P.3d 484, 71 OBJ 2668, IN THE MATTER OF A.M. & R.W.
Discussed
 1998 OK 92, 967 P.2d 1214, 69 OBJ 3242, City of Tulsa v. State ex rel. Public Employees Relations Board
Discussed
Title 45. Mines and Mining
 Cite
Name
Level

 45 O.S. 724, Permits - Applications - Bond
Discussed at Length
 45 O.S. 721, Short Title
Discussed
 45 O.S. 722, Declaration of Policy
Discussed
Title 75. Statutes and Reports
 Cite
Name
Level

 75 O.S. 250, Short Title
Cited
 75 O.S. 250.3, Definitions
Discussed
 75 O.S. 309, Individual Proceedings - Notice - Hearing
Discussed
 75 O.S. 322, Setting Aside, Modifying, or Reversing of Orders - Remand - Affirmance
Discussed
Title 82. Waters and Water Rights
 Cite
Name
Level

 82 O.S. 1020.9, Approval of Application
Cited
 82 O.S. 1020.2, Declaration of Policy - Promulgation of Rules - Consumptive Use - Augmentation of Stream Flow or Groundwater
Discussed at Length
Title 27A. Environment and Natural Resources
 Cite
Name
Level

 27A O.S. 2-1-101, Short Title
Discussed
 27A O.S. 2-10-101, Short Title
Discussed
 27A O.S. 2-10-301, Permit Required - Notice
Discussed
 27A O.S. 2-14-101, Short Title
Discussed


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA